Davis, J.,
delivered the opinion of the court:
In January, 1866, a board of officers was ordered to assemble in Washington during the following March to examine breech-loading fire-arms and to make recommendations in relation thereto. General Hancock was the president of this board; hence it has -since been known as the u Hancock Board.” One of the questions submitted for examination and recommendation was this: “ What form of breech-loading arm should be adopted as a model for changes of muskets already constructed to breech-loading muskets'?” The object of this direction is apparent: the war, then practically finished, had shown the advantage of the breech-loader, and it had left in the arsenals of the Government a great number of muzzle-loading arms of considerable value; these it was important should, if possible, be saved to the Government, and this could be done only after the invention of a practical method of converting a muzzle-loader into a breech-loader. Acting under their orders, the *362 “Hancock board” invited inventors to submit arms to the board; each inventor was to state in writing the lowest price at which his arm would be furnished in the event of its being adopted by the Government. The Berdan Fire-Arms Company, assignees of Hiram Berdan, the inventor, responded to this call, submitting several guns, one only of which is in issue now. This gun was recommended by the board, and this recommendation was approved by the Chief of Ordnance, by the Lieutenant-General, and by the Secretary of War. Nevertheless no gun was ever bought by the Government from the Berdan Fire-Arms Company, and no gun was ever manufactured by the Government which was a copy of the gun recommended by the “ Hancock Board.” The contrary is not alleged; but it is contended that the Government adopted devices invented and patented by Hiram Berdan (plaintiff’s assignor), devices which appeared in the arm submitted to the board, devices which were, in effect, recommended by the board for adoption. It is also contended that later inventions of Berdan, patented by him and assigned to plaintiffs, were used by defendants.
Four patents are relied upon by plaintiffs. These we shall first examine, and if we find that the patents are valid and that defendants have used the protected devices, we shall then decide as to the alleged obligation of defendants to pay for such use upon the theory of a contract, express or implied, between them and plaintiffs.
All inventions relating to improvements in small-arms and fixed ammunition turn upon points often difficult to be made clear without model or drawing, and always difficult of comprehension to one not skilled in the art. The construction of the modern small-arm and its ammunition depends for superlative success upon improvements in the various details o± which they are composed, and many of those details are almost minute in size. We have heretofore heard argument upon a change in cartridge construction which could barely be seen by the naked eye; we have in this case listened to a discussion about a space which could be filled by the thickness of a sheet of writing-paper, and it has been debated whether the paper did or did not fill the space.
The value or novelty of an invention does not at all depend upon the size of the object invented, but the minute changes, *363 which in fire arms are alleged to be important, are most difficult of clear elucidation and explanation.
The state of the gunne^' art in I860, when Berdan took out liis first patent, is so well known that we need only refer to it generally.
The first and the last form of fire-arm is the breech-loader. When' and where the breech-loading cannon first appeared is difficult to determine, but its existence antedates the discovery of this continent, and it was in use long before the musket-With loose ammunition and crude breech devices, the breech-loading model was dangerous, uncertain, and short lived. An inexact breech mechanism permitted the escape of gas, flame, and smoke, thus corroding and injuring the gun and placing the gunner in danger; thence came the resort to the familiar muzzle-loader, an arm now looked upon as antiquated through the revival of its progenitor. The great advantage of loading at the breech has always been recognized, but it was for very many years not found practicable to surmount the difficulties and dangers presented by this design. The turning point in the art was found in the metallic cartridge; this cartridge made possible a complete gas-check without a tight jointed breech mechanism.
The complete result of a single-fire breech-loading military arm, such as is shown in the army gun of to-day, was not attained in a single stride; that result was reached by multitudinous effort continued during very rnanyy ars; no one of these efforts made a marked advance in art, no one of them covered a new principle, but all have led by successive and slight gradations to a successful single-fire musket; a musket which, it is probable will be soon replaced through a like process by a magazine gun of a type yet to be entirely and finally developed.
Pauly, in 1816, endeavored, through a “ culot, plug, or cartridge stopper,” to produce “ an air-tight or perfect closure between the movable breech and the body or remainder of the gun;” yet, although often experimented upon, the successful metallic cartridge was not made for nearly fifty years.
The metallic cartridge was looked upon, and rightly, as the solution of the problem of safe loose-jointed breech mechanism; it was early recognized that a cartridge acting as a gas-check was necessary to the production of this loose mechanism ; a *364 mechanism which should uot rust and corrode under smoke, ■or expand and bind under heat; which should take a firm bearing during recoil, and which should be safe from the explosion of gas escaping backward from the barrel into the breech receiver and under the breech-block. Yet the war of 1861-65 was fought with muzzle-loaders and a paper cartridge.
Morse had made, during the few years prior to 1861, some substantial advance toward official recognition of his gun as a military weapon; Spencer’s carbine was used during the latter part of the war to a limited extent, and Berdan, an early and ardent advocate oí the breech-loader, was successful in having his men furnished with that class of arm.
From this it will be seen that we must approach this case with the recollection that there is not in breech-loading arms a new general principle; on the contrary, the art is one peculiarly marked by extremely slow .advance; the cartridge suggested in 1816 was not perfected for forty-odd years, and a loose breech mechanism was uot successfully introduced until later. We are told there are in the Patent Office some two thousand patents upon fire-arms, and of these over thirty are produced in this case for our examination.
The condition of the art from 1866 to 1870 must be borne in mind very carefully in this case ; that period is the one covered by the patents in issue, and it is the period of greatest activity of invention in this direction. During these years inventors first began to foresee a solution of the problem which should produce a safe, simple, effective breech-loading military arm, and during this period the Government took its most serious action towards the production and adoption of such an •arm. Many minds were during these years working independently, working in different channels, working by different methods, all aiming to achieve the same result.
. None of the inventions which we have examined in relation to this case involve a generic idea of principle. They all relate ■to details of construction, and embody the combination in different forms of old and familiar elements. So, in the plaintiffs’patents, it is apparent that the claims are narrow; they mover no general principle; they involve no novel elements; but are only, and only pretend to be, new combinations of old •elements destined to accomplish, in a novel manner, a desired .and useful result. '
*365 That is, they are narrow claims, and are to be strictly construed.
The Beidan gun submitted to the “Hancock” board, and to. which this branch of the action relates, embodied a design for a converted muzzle-loader. A full description of this and the other devices, either those of Berdan or those alleged to have anticipated him in the inventions plaintiffs claim to be novel,, appears in the findings of iact. The descriptions there are accurate, and form the official record upon which the case turns. In the opinion we shall be more colloquial in expression.
The gun which Berdan laid before the “ Hancock” board was, plaintiffs contend, covered by letters patent (No. 52,925), dated February 27,1866; it was strongly recommended by the Board, and for convenience we call it the gun of 1866. Other guns were presented by plaintiffs at the same time, but they are not now in question.
The Berdan gun of 1866 embodied a design to convert a muzzle-loader into a breech-loader upon the swinging breech system. Gutting open the barrel from the top, just forward of the stock, Berdan inserted into the chamber thus disclosed his swinging breech-block. This was made in two parts, jointed somewhat forward of the middle; the forward end, called the breech-piece, was fastened to the top of the barrel by a hinge; this hinge was part of a flat plate which extended along the top of the barrel and was fastened into the barrel by screws, and the holes in the plate into which these screws were inserted were somewhat elongated, so as to allow very slight play in the plate. The rearpart of this jointed breech-piece is called the “ brace,” and in speaking hereafter of the parts of this gun we shall call the forward end of the compound structure the “breech-piece” and the rear end the “brace.” The brace (the after end or tail-piece of she breech structure) is hinged on top to the breech-piece proper; this hinge has its center in the plane of the axis of the bore when the breech is closed; the brace drops after loading into the back part of the breech-receiver and (with the breech-block) entirely fills up the space in the breech-receiver between the barrel and the recoil-shoulder.
The rear end of the breech-receiver is beveled; that is, it is not perpendicular to the axis of the bore, but inclines back *366 ward from the bottom up, and accommodates at each side the •‘ways” for ejecting the cartridge. The brace is beveled at each side upon the same angle as the rear of the breech-receiver, while in the center of the rear of the breech-receiver— that is, at the head of the breech-pin and between the cartridge ejecting “ways” — is a recess, and a corresponding shoulder upon the rear of the brace fits into this recess. The rear wall of the recess and the wall of the shoulder which abuts upon it are substantially at right angles to the axis of the bore, so that when the gun is held horizontally these walls are perpendicular. Here then appears what is called the “ square ” recoil-shoulder.
So far we have described those portions of the mechanism which relate more directly to the recoil, but, in addition and to prevent a tendency in the breech-block to rise during explosion, Berdan had upon the forward end of the breech-block a circular jirojection, or a “boss,” so arranged that when the breech-piece was closed the “boss” should enter somewhat into the barrel and so lock the breech-piece down, preventing a rising of its forward end. The system of ejecting the cartridge found in this gun we shall consider later, and for the moment lay it aside.
To understand this breech mechanism it is best to glance at the reasons for its use.
It is apparent that a “square recoil-shoulder,” as it is called, that is a recoil-shoulder at right angles to the axis of the bore, is an advantage in breech-loading fire-arms, as it takes up the recoil in the line of the axis of the bore and transmits it nearly horizontally through the stock; whereas if the recoil be taken upon a beveled recoil-shoulder there is a natural tendency to throw up the rear of the breech-piece out of the breech-receiver and so to cause accident.
A. practical' difficulty is encountered in attaining a square recoil-shoulder in a converted muzzle-loader; for if a piece be cut out of the top of the barrel of the old musket, leaving a “ square” shoulder (one at right angles to the axis of the bore), and a solid breech piece be provided hinged at the forward end to the barrel, with a “square” shoulder, it wrill be seen that the breech-piece can not be opened, if the hinge be attached while the breech-piece is in the receiving-chamber, or shut, if the hinge be attached when the breech-piece is out of the *367 chamber and swung up and forward ; as then both surfaces, that of the recoil-shoulder and that of the breech-piece, being at right angles to the axis of the bore, there remains no space for the circular movement described by the lower angle of the rear end of the breech-block, when it is, at the same time and with one movement, swung up and forward upon the hinge attached to its top at the forward end.
A u square” recoil shoulder with a breech-block swinging up and forwards was considered advantageous. The combination of these two elements in one device was first obtained by Ber-dan in his jointed swinging breech-block, which gave him a u square ” recoil-shoulder and (by use of the joint) the upward and forward swing.
The claims made by Berdan in his application for letters patent (So. 52925) were as follows :
“ 1. A jointed swinging breech-piece, when the detached end of the brace is forced or held in position by the hammer, or other suitable projection from the hammer-shaft, substantially as herein set forth, for the purpose of communicating less strain 10 the hammer than when an unjointed swinging breech-block is used.”
“2. The combination of the brace D, jointed to the swinging breech-piece, the hammer, and the safety-notch h in the tumbler, substantially as described, whereby the hammer while held back from the firing-pin is made to prevent the detached end of the brace from rising above a position in which it locks the breech-piece.”
Then follows a claim for a firing-pin (not in issue), and the fourth claim was as follows:
“4. The elongated hole or holes in the strap B or other part of the hinge connection, of the swinging breech-piece 0 in combination with the circular projection b, provided on the face of the breech-piece to enter the chamber of the barrel, substantially as herein specified, whereby the self-adjustment of the breech-piece to the recoil-bearing is provided for, and the liability to strain the hinge by any rear or upward tendency of the breech is counteracted.”
The fifth claim related to the ejector, which we shall consider hereafter.
There is a point made by defendants as to the identity of the gun shown in 1866 to the “ Hancock Board ” with that described in the patent, and we find this difference between them : In the patent the breech-block is shown as fastened to the barrel by *368 a plate screwed, to the top of the barrel; in- the Hancock gun the plate is abandoned and the breech-block is fastened by a band around the barrel; as this fastening is more secure than the plate screweu into the barrel, Berdan found it unnecessary in the Hancock gun to retain the locking device upon the forward end of the breech-block, by which a “ boss” entered the rear of the barrel and held the forward end of the block down during recoil. He also added under the firing-pin a lip which falls under the hammer when the breech is closed and the hammer is down; this does not appear in the patent. A change in the ejecting mechanism also was made.
There was before the “ Hancock Board ” a gun invented by an employé in the Springfield Armory, patented by him in 1865, and known as the Allin gun. It may be thus described:
The rear of the top of a muzzle-loader’s barrel is cut away and into it is inserted a solid breech-block, hinged at the forward end to a plate fastened to the top of the barrel. The rear end of the recoil-chamber is beveled; that is, it rises from the bottom of the chamber upon an angle tending backward, and the rear of the breech-piece is similarly beveled. The breech-piece is fastened down at the rear by a cam-latch, which locks into a recess in the head of the breech-pin, and this latch is operated by a shaft leading horizontally to the right side of the barrel under the hammer, where there is fastened to its end a lever or thumb-latch, which prevents the hammer from striking the firing-pin until the cam is in place and has locked down the rear end of the breech-block, and which is a handle to unlock the cam-latch when the breech-block is to be opened.
So far, then, we find described a solid breech-block beveled at the rear end, working in recoil against the beveled shoulder, with the tendency to throw upward met and counteracted by a cam-latch which has no other duty than to prevent the rear end of the breech-block from blowing upwards during explosion. This cam-latch takes no share in the recoil, which is entirely borne by the beveled recoil shoulder. There also appears in this gun a device intended to prevent premature firing through the position of the thumb-latch or handle upon the end of the cam-latch shaft.
The forward end of the Allin breech-block is thus locked do wn:: The rear end of the barrel is beveled at the top, and the bevel slants upwards and backwards; the top of the breech-block at *369 its forward end is also beveled, so that when the block is down and closed its forward end at the top locks into and under the top of the barrel, forming a joint intended to prevent the block from lifting out at the forward end.
In his specifications Allin stated that his gun had six distinct advantages; of these the second alone is now important:
“ Second. It is impossible to blow the piece A [the breech-block of recoil-block] open, it being fastened at each end as described [at the rear by the cam-latch, forward by the joint under the barrel]. It will lessen the danger in this connection that it does not depend at all upon the pin d [the hinge-pin at forward end of the recoil-block], as this may betaken out without rendering the gun useless or dangerous, as a solid block 0 [the lower portion of the recoil-block, which rests upon bottom of breech-chamber and most directly transmits the recoil] is interposed between the breech-pin and the end of the cartridge in a direct line.
The words in brackets are inserted by us to explain the letters in the absence of the drawing.
In view of the line of argument taken at the trial certain points may here be noted upon this branch of the case.
Alliu’s breech-block was solid; it took up the recoil upon a beveled shoulder; it depended for safety against upward thrust at that point upon a cam-latch which performed no duty in taking up the recoil; it depended upon the joint at the forward end to prevent possible upward thrust at that point.
Berdan, on the other hand, using a jointed breech-block, was able to obtain a square recoil shoulder between the beveled ejector “ ways,” and so to take the thrust upon the head of the breech-pin substantially in the line of the axis of the bore.
Allin provided against any upward tendency in the forward end of the breech-block by the beveled joint already described, while Berdan accomplished the same object,in his patent by means of the circular boss at the forward end of the breech-piece, which entered into the barrel a device abandoned in the gun submitted to the ‘‘Hancock Board.”
It is claimed by plaintiffs, and it is true, that the Allin device was tight-jointed — that is, there was no room for play of the parts. Experience has shown a loose-jointed mechanism in breech-loaders to be more advantageous than a tight-jointed mechanism. The improvement in fixed ammunition has developed the metallic cartridge into an efficient gas-check, so *370 that it is no longer vitally necessary to provide in the breeeli mechanism against explosion under tlie breech-block. It is now possible to introduce a loose-jointed mechanism which is simpler iu construction, less likely to get out of order, easier to clean and repair, less likely to bind through expansion, and which has fewer delicate adjustments than the tight-jointed mechanism required when the breech-piece acted as a gas-check.
The Berdan uevice, presented to the board of 1866, was a better gun than the Allin gun, and we have no reason to doubt, from what has been shown to us, that the board were right in their commendation of the invention. But that is not the question in issue. We must keep steadily in mind the one point under consideration. This point does not relate to the value of Berdan’s inventions, but to the problem made up of these two elements: What did he patent — not what did he invent — and have the devices patented by him been incorporated into the Springfield gun?
Turning now to the Springfield gun, we lay aside, for simplicity of statement, intermediate models and take up the gun of 1884, which is for all the substantial purposes of this action the one deemed to embody the breech devices now sued upon.
It is claimed that in this design the cam-latch performs the office of the brace in the Berdan gun; that the one is the mechanical equivalent of the other. As the use of the words “cam-latch” and “brace” may lead to some confusion, we shall endeavor to describe the Springfield gun somewhat colloquially, and omit for the moment allusion to the point made by plaintiffs that what in the Springfield gun is called the “ cam-latch ” is not such, but is in fact a “ brace.” In an endeavor to attain clearness of description we shall now call it a “ cam-latch.”
In the Springfield gun the breech-block is solid and fills all the breech-chamber except iu this: it does not bear against the rear end of the chamber, and that end of the chamber is not intended to take up any part of the recoil, except upon the breech-pin, as hereinafter shown.
The breech-block is fastened by a hinge at its forward end to the top of the barrel. The hinge-pin is of less diameter than the hinge-holes through which it passes, thus permitting some movement iu the hinge to give play, and so that the pin may not be cut during recoil.
*371 There is a recess in the head of the breech-pin; this is-somewhat concave in form; into this the cam-latch locks; the pin fastening the cam-latch hinge is smaller than the hinge holes through which it passes, and this pin or shaft extends horizontally beyond the barrel, terminating in a handle or thumb-latch, as shown iu the Allin gun; when the breech-block is shut and locked this handle lies under the angle of the hammer, but not in contact with it, and is so arranged that with the hammer in the third or lowest notch (or entirely down) the ■breech-block can not accidentally unlock and open. In locking or unlocking the cam-latch this handle turns across the head of the firing-pin, as in the Allin gun, and thus operates to prevent premature explosion.
In firing, the breech-block sets back under the force of recoil, the loose hinge at the forward end gives play there, the loose hinge of the cam-latch gives play at that point, and the recoil is transmitted through the breech-block to the cam-latch, with the head of which it comes in direct contact, and then throughi the cam latch to the head of the breech-pin. By reason of the small diameters of the respective pins or shafts of the two hinges, as compared to the hinge-holes through which they pass, no strain is brought upon these hinges by the recoil.
In Allin’s gun the cam-latch was simply a locking device, while in the Springfield gun it also takes up and transmits the recoil, as did the brace in Berdan’s gun of 1866.
Examining plaintiff’s claims (patent 52,925), we find, as to the first one, a patent issued not for a jointed swinging breech-piece, but for a jointed swinging breech-piece “ when the detached end of the brace is forced and held in position by the hammer or other suitable projection from the hammer-shaft, substantially as herein set forth.” The purpose of the invention is described to be a single one, viz: To communicate less strain to the hammer than when an unjointed swinging block was used. It would seem then, from this claim, that there existed breech-locks whose rear ends were held down in the chamber during explosion by the hammer or some other suitable projection from the hammer, and this was the fact; that this system, it was deemed by Berdan, could be improved by substituting a jointed for a solid block, and that his patent was — not for a jointed swinging block — not for a device to hold down the rear end of a breech-block during firing either *372 by the hammer or by a projection from the hammer-shaft — but through a combination of the two elements, neither one of which was claimed as new, to provide additional security against any upward tendency in the rear of the block during explosion.
Turning now to the patentee’s specifications in explanation of his claim, it will be seen from the description therein that the invention relates “ to a construction of and mode of applying, operating, and securing a swinging breech-piece which is especially well adapted to the conversion into breech-loaders of fire-arms originally constructed for muzzle-loading, but also applicable to breech loaders in general, and by which great efficiency and safety from accidental discharge are obtained.” The object, then, of the invention is, in the specifications, shown to be what is so clearly stated in the claim : an endeavor to obtain safety through a device communicating less strain to the hammer than when an unjointed block was used.
After describing other parts of the invention, not at this moment important, the patentee said, as to his second claim, “ a portion of the brace is so arranged with respect to the'hammer that when the hammer is locked in a position out of contact with the rear firing-pin - by the entrance of the sear into a safety-notch in the tumbler, it will, to such extent as the power of the mainspring is effective,' prevent the brace from rising sufficiently high to unlock and permit the opening movement of the breech-piece; and when the hammer is brought into the aforesaid locked position it will, if necessary, bring the brace to a position against the recoil-bearing to secure the breech-piece in a closed position.”
Further on in the specifications, where the device is described in detail, we find this part of it designed to prevent the accidental opening of the breech-piece. This, it should be remembered, was of particular importance in the Berdan device, where the breech apparatus depended entirely upon friction for its seat in the receiver, being without locking apparatus at the rear, other than is provided in this claim through the hammer.
Berdan’s first claim (patent 52925) is not general. It does not cover a loose-jointed device, but a strictly defined combination. He there claims a jointed swinging breech-piece when (and only when) the detached end of the brace is forced of held in position by the hammer or other suitable projection from the hammer-shaft. . In the Springfield gun the cam-latch *373 (claimed to be the mechanical equivalent of the Berdan brace) is not forced into or held in position by the hammer or other suitable projection from the hammer-shaft. On the contrary, there is no connection between the cam-latch and the hammer, and the handle attached to the cam-latch shaft lies (when the breech is closed) under the hammer, whereas the Berdan hammer falls upon the tail of the brace and holds it down with the full strength of its spring.
The Alliu gun had no play in its parts; it was tight-jointed. The idea seems to have been to absolutely fill the breech-chamber with the breech-block, so that when closed the block would bear tightly against the end of the barrel at the forward end, and tightly against the recoil-shoulder at the rear end, and thus produce a practically solid barrel from muzzle to recoil-shoulder, with no give or play at any part. It is apparent, as we have mentioned, that a breech-block of this kind, so tightly fitting, could not be what is termed “ square ” at the rear end; if it were it could not be opened if shut, or shut if opened, for there must be play for the circular movement described by the rear lower part of the breech-block while swinging at the same time upward and forward upon the forward hinge; hence the bevel of the rear of the breech-block became essential, as well as an equivalent bevel upon the recoil-shoulder; this led to danger of upward thrust of the rear of the breech-block during explosion, which Allin counteracted by the cam latch; this latch in his gun took up no horizontal'thrust during the firing, but simply and only locked the breech down so that it should not throw up during recoil. Speaking broadly, during fire the Allin cam-latch acted against perpendicular pressure, and the Berdan brace against horizontal pressure.
In the Springfield gun the cam-latch performs an additional office to that of Allin’s cam-latch. The hinge-pin of the forward hinge and the cam-latch shaft are purposely made small and the hinge loose, that the pin and shaft may not be subject to injury during recoil and to permit play; the horizontal elongation of the hinge-pin hole permits the breech-block to slide bodily backwards under the influence of the discharge; the cam abuts against the surface of its recess in the breech -block at one end and transmits the recoil from the surface of this recess at one end to the face of the breech-screw at the other end without subjecting the shaft upon which it turns to any *374 strain; by the elongation of the hinge-pin hole in the- breech-block and the intentional looseness of the cam-shaft and arbor in the bearings the transmission is effected (through the interposition of the cam) of the force of recoil from the breech-block to the breech-screw.
The bearing of the cam is above the center of the breech-screw, and its resistance consequently, through the resolution of the force of recoil, tends to press the rear end of the breech-block downwards. The frout end of the block is secured against lifting, in case of escape of gas from the cartridge, by the engagement of the flanges at its forward end under ears made upon the receiver substantially in the form used by Allin.
The Berdan gun (patent 52925) was not loose-jointed; when the breech-block was down there was no play, for then the block abutted against the barrel at one end and against the breech-screw at the other. Berdan by jointing his block procured a square recoil-shoulder against the end of the breech-pin, but he did not procure any play in the parts; there were elongated holes in the plate fastening of his breech-block, as shown in the Patent Office model, a device replaced in the gun shown the “ Hancock ” board by a band which has a minute slip upon the barrel under strong pressure; but neither the holes nor the band are even claimed to give looseness of construction; they only take up some slight wear of the parts.
The square reeoil-shoulderand the elongated holes appeared so often and persistently in argument that we are forced to allude to them as incidents in this proceeding; but they are not important to a decision, as we have seen from the recital of Berdan’s specifications and claims in his application for patent.
The element of safety was the one aimed at by Berdan; his claims show that he was not endeavoring to patent a loose-jointed breech-block system, whether obtained by elongated holes or a loose band; nor did he intend to patent a square recoil-shoulder in combination with a jointed swinging breech-piece swinging upward and forward, nor to patent such a breech-piece in combination with either a square recoil-shoulder or with elongated holes in the hinge fastening, or either of them.
Hisfirstclaim is for ajointed swingingbreech-pieeeheld down by the hammer or some other suitable projection from the hammer-shaft. If the present Springfield gun have a jointed *375 mechanism, as claimed by plaintiffs, still the Government is 'not- using the device covered by this claim, for in the Spring-held gun neither the hammer-guard nor the firing-pin guard is intended to hold down the breech-lock -by catching under the hammer ; on the contrary, the resultant force from explosion acting through the block and cam-latch tends backward and downward upon the head of the breech-pin, thus acting to hold the rear of the breech-block down in the chamber, and any office p 'rforined by the cam-latch in locking the breech-block is performed in the Springfield gun of to-day as it was performed in the Allin gun of 1865, unless in one particular, which we shall hereafter notice in connection with another claim.
The third claim (patent 52925) is for the firing-pin, not now in issue; and the fourth is for the elongated holes in the hinge connection of the swinging breech-piece in combination with the “ boss,” which, projecting from the front end of the breech-piece, enters the barrel when the breech-piece is down for a purpose thus stated: “ whereby the self-adjustment of the breech-piece to the recoil-bearing is provided for, and the liability to strain the hinge by any rear or upward tendency of the breech is counteracted.”
In this gun of Berdan’s (patent 52925) the elongated holes do not allow of any play in the parts; they simply allow the taking'up of slight wear produced by friction upon the recoil-shoulder or the rear of the breech-block; this was admitted in argument and so requires no careful examination; but it may be noted that Berdan’s object, as shown in the specifications, was not to protect the hinge-pin, for while he states that the elongated holes may be in the hinge, he does not look upon this position as important and he did not put them there in his drawing or model] nor was this important for the purpose now admitted as the one he had in view, which was merely to take up wear by friction and not to produce a loose-jointed gun.
The entering “boss” does not appear in any Springfield gun, but we do find a flange at the iorward end and on top of the breech-block which engages under an ear upon t.he top of the barrel substantially after the Allin-design.
The elements of the combination set forth in this fourth claim do not appear in the Springfield gun, and it may be again noticed that in the gun presented by plaintiffs to the Hancock Board in 1866 the plate and elongated holes were *376 abandoned and were replaced by a band, and tbe entering “boss” was omitted as unnecessary because of the greater strength in fastening obtained by the band as compared to the plate screwed onto the barrel.
The second claim (patent 52925) combines (a) the brace, (b) the swinging breech-piece, (c) the hammer and safety notch in the tumbler, to accomplish a purpose thus described: “ Whereby the hammer while held back from the firing-pin is made to prevent the detached end of the brace from rising above a position in which it locks the breech-piece.”
In the Berdan gun (patent 52925) there was no method of locking down the brace or tail of the breech-piece. Except for the hammer it was held in line with the barrel simply by friction ; when the Berdan hammer was upon the head of the firing-pin (which projects through the rear end of the brace) it operated to hold the brace down; then by use of the third notch the hammer could be held slightly relieved from contact with, the firing-pin, and yet so close, to it that the brace could not accidentally open, as in so doing it would strike the end of the hammer. This is the result covered by this claim.
In the Springfield gun the cam-latch shaft lies under the angle of the hammer; the arrangement in the Springfield gun is intended to prevent premature firing, but it is not intended that the hammer shall perform any office in holding down the rear end of the breech-block during explosion; in the Springfield gun the resultant foi’ce during recoil tends to hold the rear end of the block down. The arrangement of the cam-latch shaft as found in the Springfield gun makes it impossible for the breech-block to open accidentally when the hammer is in the third notch; you can not then lift the block without striking the hammer. The device found in the Springfield gun of to-day to prevent accidental unlocking and premature explosion is exactly the device found in the Alliu gun except in this: The Allin gun did not have the third notch.
The Allin gun had just the characteristics now in issue, except the third notch; with this exception, in so far as this locking device is concerned, the Springfield gun of to-day operates as did the Allin gun of 1865. In the Allin gun the cam-latch shaft falls under the angle of the hammer and can not be lifted when the hammer is down; the handle of the cam-latch is so arranged as to prevent contact by the hammer with the firing- *377 piu in opening or closing the breech-bloek, and the drawings of this part of the device as appearing either in the Allin gun or the present Springfield gun could not be distinguished. Allin’s cam was not intended to take recoil, but to counteract upward thrust. That is, it was purely a locking device, and his specifications show that, after locking the cam into its recess in the recoil shoulder, if, by any accident the lever at the end of the cam-latch shaft should not be turned down it is impossible to fire the gun, for the hammer in coming down will strike the lever and throw it up against the breech-block, thus preventing the hammer from striking the firing-pin, or if the lever be turned down part way but not entirely the hammer in coming down strikes over it and forces it with the breech-block down into place; and this is the device in the Springfield gun.
The second claim of plaintiffs’ patent 52925, covering this subject, is a combination made up as we have seen of these elements:
First, the brace: We are of opinion that the change in construction of the cam-latch in the Springfield gun, whereby it takes all the recoil, has made of it a brace without sacrificing its qualities as a cam-latch.
Second, a swinging breech-piece; this is found in the Springfield gun and the Allin gun.
Third, thehammer; and fourth, the safety notch, both found in the Springfield gun.
The result aimed at by the Berdan combination was thus stated: “ Whereby the hammer, while held back from the firing-pin, is made to prevent the detached end of the brace from rising above á position in which it locks the breech-piece.”
Admitting the cam-latch to be a brace for the purpose of recoil, it nevertheless remains a cam-latch for all locking purposes! and the operation of the Springfield device is, first, to prevent the arbor turning and thus unlocking the latch; second, to prevent an upward movement of the rear end of the breech-block. Berdan’s device was intended to prevent danger from explosion of gas under the breech-bloek as well as to prevent,premature firing. The Springfield device simply prevents the breech-block from opening accidentally should the gun be held muzzle down or turned over barrel down. This was done in the same way by Allin, and we are of the *378 opinion-that with Allin’s gun before him, or the Springfield gun before him, and knowing of the three-notched tumbler (which is old), any mechanic could have attained the result now found in the Government gun by simply adding a notch to the two-notch tumbler in the Alliu gun. The change in the cam-latch whereby it takes the recoil had involved no change in the position of its shaft and thumb-piece, and the addition of the third notch to the existing device was an exercise of ordinary mechanical skill.
The Berdan gun of 1806 was a valuable gun, a much better arm than the Allin gun, and we have no doubt that it formed a substantial step in aid of the material improvement of breech-loading small-arms. Berdan procured through his device what had not then been invented — a method of combining in a converted muzzle loader, a breech-block swinging upward and forward, with its recoil taken upon a shoulder substantially at right angles to the bore of the gun; he brought the resulting force of recoil substantially in line with the axis of the bore and avoided the use of the dangerous bevel upon the recoil shoulder and rear of breech-block. It may well be that thus Berdan gave to Army officers the idea which led to the broadening of the face of the cam-latch, to the loosening of the hinges, and to the other changes in the Allin gun which resulted in tbe present loose-jointed mechanism by which the recoil passes to the breech-pin through the cam-latch withoutstrain to any minor part. Whether this be so or not, whatever be the history of the evolution of the present army gun, plaintiff’s patent No. 52925 does not cover it.
The patentee did not aim in his application to protect a loose-jointed mechanisn through elongated holes or otherwise; he did not claim the practical attainment of a square recoil shoulder in combination with such a mechanism; on the contrary his claims were very narrow — first, a jointed swinging-breech-piece held in place by the hammer. This does not appear in the Springfield gun, for if the cam-latch be so constructed as to make it aud the breech-block together, mechanically the Berdan jointed swinging breech, still it lacks the quality of being held in place by the hammer, but has the very substantial advantage of holding itself in place by the resulting force of the recoil, aided in case of need by the perpendicular resistance of the cam-latch. The fastening of the *379 forward end of the Springfield breech-piece is that- shown in the Allin gun. The patentee also' claimed the combination of the brace, the swinging breech-piece, the hammer, and a safety notch, a mechanism intended to keep the brace from opening accidéntally. • So far as a device admitting of this description occurs in the Springfield gun it is a reproduction of the device shown in Allin’s patent of 1865, with ' a third notch added in the tumbler; the addition of this notch being merely a mechanical change.
Plaintiffs have shown no patented rights to the breech-block system of the Springfield gun, whatever may be the credit to which their assignor, Berdan, is entitled for the incentive given by him to inventions in breech-loading fire arms.
In the patent of 1870 (No. 101418) plaintiffs rely upon the second claim, which is as follows:
“ The extension of the rear end of the jointed brace of a swinging breech-piece or of the rear portion of a jointed breech-piece in a lateral direction, in such manner that the extension serves both as a guard to the firing-pin and a handle to operate the breech-piece.”
The invention assumes the existenceof the “swinging breech-piece,” or of the “jointed breech-piece,” and adds to it a lateral projection, serving to prevent premature discharge and to open and close the breech-piece. What we have already said as to the second claim under patent 52925 leads us to the conclusion that plaintiffs have no rights as against the G-overnment under this claim of the later patent.
Turning now to the extracting and ejecting devices, we shall first examine the claims upon this subject covered by patent 52925.
The mechanism of the patented gun may be thus described:
In the middle of the hinge shaft of the breech-block and fastened to it is a slight projection or spur; this turns with the hinge, and to give it play through the barrel, as the hinge turns, a slot is cut in the rear end of the barrel top ; when the breech is closed this spur is above the cartridge and clear of it; after firing the breech is turned upwards and forwards, while the spur attached to the hinge shaft turns with the shaft downwards and backwards, and thus engaging the flange of the cartridge carries it for a short distance back and out of the barrel. The object of the spur is to loosen and start the car- *380 bridge. In the patented gun there is also found in the bottom ■of the breech receiver near its forward end a hook; this hook has a movement in line with the barrel; it runs in a slot and is controlled by a spiral spring set under the barrel in the stock; this spring, when at rest, holds the hook at the rear end of the slot.
This ejector device operates in thus: The breech being thrown open the cartridge is placed in the receiver; it is then shoved forward into the barrel and the breech is closed; in the forward movement of the cartridge ini o the barrel its shoulder, rim, or flange catches the ejector hook, which is drawn forward ■against the resistance of its spring until the cartridge is in its place in the barrel and there secured by the shut breech-block; •in closing the block the overhead spur recedes into position above the cartridge flange. After firing the breech-piece is raised, the spur descends and moves backwards, so loosening the cartridge and. moving it slightly back in aid of the hook, whose spring, now free, carries it quickly back, drawing the cartridge, which, impelled by the velocity acquired from the spring, shoots up the “ ways ” at the end of the breech receiver ■and so out of the gun.
In the model before the Hancock board the following changes in the ejec;or device appeared: The extracting spur at the top was retained; the hook was transferred from the bottom of the receiver to the left side, and was a projection from the upper ■end of a U-spring, the spiral spring being abandoned; a friction plunger was placed in the middle of the bottom of the receiver, held up against the cartriuge-head (when the gun was loaded) by a flat spring placed underneath the barrel.
The inventor claimed (under patent 52925) a combination made up of these elements: The spur, the hook, the spring (shown to be a spiral spring), and the “ ways.” This combination, he claimed, “ when employed in a breech-loading firearm having a recoil shoulder, 0, in line with and at right angles to the bore,” for the purpose thus described — to completely eject a cartridge or shell without elevating the muzzle, ■substantially as set forth in his specifications.
The Allin gun of 1865 also contained an ejector device, which may be thus described:
The forward upper end of the breech-block on the right side projects over the barrel and engages under the hinge; the *381 lower side of this projection is curved, and in it are cut several teeth; under this projection, outside of the receiver but with its-top slightly below the plane of the top of the breech receiver, is a rack which is fitted on its top with similar teeth and which runs on a slide parallel to the axis of the bore and is held at the-forward end <5f this slide by springs concealed in the stock forward of the breech-receiver; a hook attached to this rack enters the receiver and slides with the rack in the line of the barrel in a longitudinal slot cut in the receiver on the plane of the rack. When the breech is closed the rack is at the forward end of its track, the pin-hook is at the forward end of the receiver — in fact, slightly within the barrel, and engages the forward side of the cartridge-rim or shoulder; when, after firing, the breech-block is raised and swung forward, the teeth of the pinion engage those on the rack and carry it back towards the rear of the receiver; thus, through the interposition of the hook which has caught the cartridge-rim, the cartridge is withdrawn, from the barrel into the receiver. This was a device for extracting, not for ejecting, the cartridge.
Allin has also a device for releasing the rack when this work is done, and so permitting its spring to draw it forward again to its first and normal position. A plunger in the bottom of the receiving-chamber was intended to, but did not, in practice, eject the cartridge. The Allin device extracted the cartridge from the barrel, but did not successfully eject it from the receiver.
The Springfield gun of 1866 has a (J-spring, a hook, which is a slight projection from the upper end of the spring; this-hook runs in a slot at the side of the barrel; there is a spur attached to the hinge at the top, a friction plunger, and in place-of the “ ways ” a deflecting stud is placed in the bottom of the breech-receiver. This ejector device, except for the omission of the “ ways” and the substitution of the deflecting stud, is the device found in the gun submitted by Berdan to the “ Hancock ” board.
Several patents have been introduced as anticipating this-Berdan device, and to these we shall now give some consideration
The Peabody gun first in date of patent (July 22,1862) shows none of the elements of ejectors in issue now and does not require consideration in this connection.
*382 Joslyn (patent dated August 4, 1863) described a cam-sliaped projection with a beveled edge secured to the forward end of the breech-piece and so situated in respect to the cartridge that on elevating the breech-piece the beveled edge of the projection bore against the flange of the cartridge, “ and withdraws the same to a limited extent from the bore of the barrel.” He also describes a spring *•' situated in an opening formed in the stock in the rear of the barrel,” secured to a plate attached to the under side of the stock, tne spring being of such length that it just bears at its upper end against the inside of the cartridge flange. He thus describes the operation of his device:
“ During the elevation of the breech-piece the beveled projection b bearing against the flange of the case, withdraws the latter from the bore to a very limited extent. At the same time the edge of the projection b bears against the side of the case and returns the same, thereby preventing the spring from forcing the case from the bore until the latter is thoroughly exposed and the breech-piece presents no impediment to the withdrawal of the spent cartridge. The full force of the spring is thus reserved until the breech-piece is thrown back and the projection b is free from contact with the cartridge case, when the spring acting on the same will suddenly force it from the bore and discharge it clear of the fire-arm.”
In this patent we first find an ejector as distinguished from an extractor; but it will be noticed from the specifications and drawings that this ejector acts entirely in the plane of the axis of the bore. The barrel is elevated above the stock so that with the breech-piece raised no recoil-shoulder remains, and the ejector performs no lifting office. This device would be useless in the Springfield gun, and in that arm would operate merely to throw the cartridge back into the receiving-chamber, but not up and out of the gun.
The Wright gun, patented in 1864, has a spur in the hinge at the top, also a hook in the bottom, which is the projection of U spring. This device will extract the cartridge from the barrel, but will not eject it from the receiver. Wright did not claim that it would eject; on the contrary, he said that his device would push the cartridge so far back as to allow its ready removal by the fingers.
Roberts obtained- a patent dated September 23, 1862, reissued September 6, 1866, in which he describes the spur, *383 claiming that it partially draws the cartridge from its seat in the barrel so that it !c can be very readily and conveniently removed by hand, or by reason of its conic form will drop out and another may be inserted in its place.”
February ‘27, 1868, other letters patent were issued to Roberts. In this device he shows the spur again and also “ ways.” There is, however, no provision for ejecting the cartridge, nor was it claimed that the device would so operate. Upon this subject Roberts said in his specifications “ as it (the breech-block) rises the hook or catch i engages with the rim of the shell of the cartridge and partly retracts it. * * * This, shell being made slightly tapering it becomes loosened by this retraction so as to fall out by its own gravity when the muzzle of the piece is sufficiently elevated.” This gun of Roberts was so arranged that by elevating the muzzle the cartridge, loosened from the barrel, would slide out.
Ro other device has been brought to our attention as existing prior to the issue of patent 52925, which, in a breech-loading arm having a receiver with a rear wall, either straight or beveled, would throw the cartridge out of the gun.
The Berdan extractor (patent'52925) was intended for rim-fire cartridges, and was not successful when used with center-fire cartridges, for this reason: The flange of the rim-fire cartridges expanded somewhat at the time of explosion, and the shell thus took a firm seat in the barrel. This expansion did not occur in the center-fire cartridges, and therefore the shell was pressed back by the ejector-spring in proportion to the speed with which the breech-block was raised ; the movement thus communicated to the cartridge was therefore not sufficiently sudden to throw the cartridge out of the receiver. To counteract this difficulty Berdan introduced a friction plunger into the receiver just behind the cartridge-head, thus counteracting the backward pressure of the spring until the breech-block was open sufficiently to allow the shell to clear the face of the breech-block when ejected, so that its motion backward should be sudden and should not be impeded by the intervening breech-block. This friction plunger, singly or in combination, was not patented by Berdan.
It appears, then, that the ejector in patent 52925 would only operate when a rim-fire cartridge was used, and so was not adapted to the center-fire cartridge.
*384 As the extracting device (patent 52925) would not operate with a center-fire cartridge without the addition of an element not found in the patented combination, to wit, a friction plunger, the importance of that element might well give rise to-discussion under other circumstances. But no device at all like the one we have been considering appears in any Government gun made after 1868, nineteen years before this action began. So we may leave this branch of the case and proceed to the next and more important issue presented.
In the Springfield gun of 1868 appears for the first time the ejecting device now in use, and the hook, spur, and friction plunger disappear from the case.
In March, 1869, letters patent were issued to Hiram Berdan for an improvement in breech-loading fire-arms; this patent, numbered 88436, covered what has since been known as the “ Russian-Berdan ” gun, and but one of its features is now in issue — that feature is thus described in claim 9 of the schedule referred to in the letters patent:
“ A spring, so applied in combination with the ejector of a breech-loading fire-arm, that by the act of opening the breech-piece it is caused to act alternately above and below the center of motion of the ejector and thereby to restrain the action of the ejector during the first part of the motion of the breech-piece, and afterwards to produce its sudden action, substantially as herein described.”
The device it will be seen was intended to act with a sudden and violent motion — a snap — and for this reason: it had been found in practice that the raising of the breech-block had gradually released the spring so that the cartridge began to move back as the breech-block went up, thus releasing the tension of the spring gradually instead of suddenly. The result was that by the time the cartridge head was finally free of the rising breech-piece it had moved some little distance back, and so had slowly taken off much of the tension upon the ejector spring, leaving that spring at the first moment of absolutely free action, without sufficient strength in reserve to throw the cartridge against the deflecting “ ways ’’ or stud with such force that it would rise out of the receiver and fall out of the gun. The problem was to find a spring which should be absolutely at rest until the breech-block was up and out of th'e way and the road for the cartridge to the deflecting stud was clear: a spring *385 which at this opportune moment should suddenly, with a snap, throw its full force against the cartridge flange giving the shell such velocity that its momentum would throw it up and out of the receiving chamber upon striking the deflecting stud or “ ways.”
We have seen that the Berdan friction plunger (not patented) was an effort in the direction of the result desired, but that device was but a step towards a perfect result. The Berdan-Bussian gun does the work and does it well — of this we have had ocular demonstration. The Springfield gun since 1868 has had the same device with one exception, to wit, instead of a flat spring as shown in the Berdan-Bussian gun it has a spiral spring which is contended by idaintiffs to be the mechanical equivalent of the Berdan device. Inspection shows no difference in the operation of the Springfield device from that of plaintiffs; they are alike in construction except for the different kind of spring.
The defense allege that the device is not novel; first, in this: That the invention was made at the Springfield Armory by a Government machinist prior to the filing of Berdan’s application for a patent. The time was very cLose between the two independent inventions of substantially the same device, but the findings show that Berdan had priority. He made application to the Patent Office July 21, 1868, while the Springfield extractor was not invented before the following September.
Some time in 1868 a device, called the Lamson or Ball ejector, was experimented with by the defendants. It was a flat straight spring attached to the top of the barrel and resting upon the plate extractor, which was hung loosely upon the hinge-pin. In actual use this device was found defective because the points would dry between the ejector-plate and the part of the spring movement upon it, and, after a certain number of extractions, it would become worthless, wearing a hole through the spring. This device would accelerate the cartridge efficiently, but soon become unserviceable and was discarded. This invention was covered by letters patent 60664, dated January 1, 1867, issued to Albert Ball.
A.s this device proved ineffective several employés of the Springfield Armory set to work to invent a practical ejector for the Government gun, one which would work efficiently notwithstanding grit, dirt, and weather; one of these em-ployés, Benjamin F. Adams, did invent the device soon after *386 adopted and since then and now in the Springfield gun. But Adams did not make his invention until after August, 1868, and Berdan’s application for a patent for his device had then been some weeks on file. Adams worked independently of Berdan, and the case presents a not unusual coincidence of independent invention.
Several devices are alleged to have anticipated Berdan. Of these two seem to be of sufficient importance to warrant examination in this opinion, although all are set forth in the findings of fact.
First is the one already mentioned.
Albert Ball obtained a patent in 1867 for an “ improvement in cartridge retractor for breech-loading fire-arms.” Ball’s re-tractor (sometimes called the “ Lamson ” ejector) was thus constructed: A flat straight spring was firmly attached at its forward end to the top of the barrel; at its rear end the spring rested upon the plate extractor, which was hung loosely upon the hinge-pin; the spring acting upon the ejector plate gave it an accelerated motion at the proper time, when the plate, engaged as it was upon the cartridge-flange, jerked the cartridge out of the barrel. This device operated as does a knife-blade, that is, to and from the center of motion, not above and below the center of motion, as in the Berdan invention. This device of Ball’s was tried at the Springfield Armory and abandoned as a failure; the point of the spring was liable to stick against the ejector; the surface of the ejector became covered by a hard deposit from the smoke; against this the spring would not work; the points would get dry between the ejector plate and the part of the spring movement upon it, and after a certain limited number of extractions a hole was worn through the spring. The invention was 'a failure and was thrown aside.
The device next adopted was that invented by Berdau or Adams. This device has been since in use and is simple, effective, and certain in its operation. The Berdan (or Adams) device avoided the difficulty which rendered the Ball extractor a failure. It does not clog from smoke, nor wear away in use; the application of the spring power is different from that of Ball, for he applied his power to and from the center of motion, while Berdan applied his above and below the center of motion, so that there was no friction except at the instant of passing the center of motion. Both Berdan and Ball aimed *387 at the same result; Berdan attained it, Ball only approached it. The success was not in the kind of spring used, nor in the ejector-plate — the plate was old; so are all springs — but in the manner in which the spring operated upon the ejector-plate in the combination. It is a small change to the eye, but it is a •change which converted failure into success.
Smoot’s patent of August 27, 1867, is also much relied upon by defendants. This consisted of a U spring under the barrel in the stock, firmly fastened at its forward end so it could move only to and from the center of motion; to the rear end •of the was U pivoted a connecting-rod, which, at its other end, was pivoted to the extractor-plate, which was substantially circular in form and turned upon the shaft of the breech-piece; it had two slight projections or shoulders close together upon one side, and nearly opposite these a long projection or arm falling under the breech-piece when that was closed.
The only arrangement of the device shown us is adapted to ■a gun having a breech-piece moving downward and forward, and therein the device thus operates starting with the breech-block closed. The first shoulder engages the cartridge head just forward of the flange, and the opposite and long projection or arm lies under the breech-piece. After firing, the breech is lowered, carrying with it the arm; this turns' the jflate and moves the opposite shoulder backward, carrying the cartridge. This movement of the extractor carries the connecting-rod of the spring upward into a position parallel to the barrel, against the force of the spring. Upon passing the position parallel to the barrel, the spring is no longer restrained by the movement imparted to the plate by the arm acting under the descending breech-piece, and the spring snaps open, throwing the connecting-rod suddenly upward and backward, thus revolving the ejector-plate quickly and bringing the second shoulder sharply against the cartridge flange, the first shoulder in the circular movement described by the plate having disappeared backward and downward. The spring we have seen moves to and from the center of motion parallel to the axis of the barrel, and the result of sharp expulsion is obtained through the intervention of a connecting-rod. The device is complicated ; it is not shown that it has ever been used or that it is useful; it can not be successfully employed upon a gun of the Springfield model. The Smoot device cau not be held to be of *388 such a nature that it would suggest to a mechanic, however-skilled, the Berdan or Adams extractor.
We do not find that the patent of 1866 (No. 52926) covers, as is contended, the extracting device shown in the Berdan-Rus-sian and Springfield-Adams arms. It is urged that the retract-iug-hook and the plate are equivalents; if this be true, still it does not aid plaintiffs, for the hook was pateuted by Roberts, and Miller described the plate. True, Berdan obtained an assignment from Roberts of the device covered by patent No. 36531 (reissued as numbers 2067 and 2068), but that assignment was limited to the right to make, use, and vend the retraction-hook and to authorize others to do the same, but only “ in connection with any arm invented or patented by said Berdan, or that may hereafter be invented or patented by him.” The Springfield gun, whether or not it contains some of Berdan’s devices, can not be held to be a gun invented or patented by Berdan in the sense of this assignment.
Finally, all of Berdan’s patents cover combinations; none cover any of the elements of those combinations, and the Russian-Berdan ejector does not present the combination shown in the Berdan gun of 1866.
We conclude that the Government is using, in the Springfield gun, the ejector device covered by letters patent No. 88436,. owned by plaintiffs.
As to the statute of limitations we see no reason to change the conclusions reached by us upon this subject in the case of Butler v. The United States (23 C. Cls. R., 335).
We are not prepared to render a final decision as to the liability of defendants for the use of the extractor device, without further proceedings, the nature of which is indicated in an order filed herewith remanding the cause.
The following is the order of the court:
The court desire to hear argument upon this question Whether the Government is liable upon the theory of an implied contract to compensate the plaintiffs for the ejector device in use upon the Springfield gun.
Also upon this question: In case the first question be answered in the affirmative what should be the measure of plaintiff’s recovery; as to this further testimony may be taken by either party if desired. Counsel are desired to indicate to the *389 ■court the testimony tending to prove' the following facts, as to the Springfield model of 18GG: (a) When did the manufacture of this model begin ? (b) When did it cease ? (c) How many guns of this model were manufactured and issued 9
As to the Springfield model of 18(38 and all subsequent Springfield models, but without distinguishing as to the different models, all being classed as though of the model of 18G8: (a) When did the manufacture begin 9 (b) How many of these guns were manufactured and issued between the date when manufacture began and the date six years prior to the beginning of this action 9 (e) How many guns were so manufactured and issued between this latter date and the date when the amended petition herein was filed 9 (d) How many guns were so manufactured and issued between the date six years prior to the beginning of this action and the date when patent 88436 expired 9