ALLIED–GENERAL NUCLEAR SER-
VICES, Allied Chemical Nuclear Prod-
ucts, Inc. and Valley Pines Associates,
Plaintiffs–Appellants,

v.

The UNITED STATES,
Defendant–Appellee.

No. 87–1481.

United States Court of Appeals,
Federal Circuit.

Feb. 24, 1988.

Brian D. Forrow, Morristown, N.J., ar-
gued for plaintiffs-appellants. With him on
the brief was Gerald P. Rooney. Also on
the brief were H. Roderic Heard and Susan
L. Walker, Wildman, Harrold, Allen & Dix-
on, Chicago, Ill., David L. Ream, Houston,
Tex., Bennett Boskey and Edwin E. Hud-
dleson, III, of Volpe, Boskey & Lyons,
Washington, D.C., Philip B. Kurland and
Alan S. Madans, Rothschild, Barry &
Myers, Chicago, Ill.

Terrence S. Hartman, Commercial Litiga-
tion Branch, Dept. of Justice, Washington,
D.C., argued for defendant-appellee. With
him on the brief were Richard K. Willard,
Asst. Atty. Gen. and David M. Cohen, Di-
rector. Also on the brief was Avrum Fing-
eret, Dept. of Energy, of counsel.

Before RICH, Circuit Judge, Nichols,
Senior Circuit Judge, and SMITH,
Circuit Judge.

NICHOLS, Senior Circuit Judge.

Beside a stream in South Carolina stands
one of the most remarkable white ele-
phants in our American history, rich as it is
in similar constructions. It is a plant which
is completely useless but has absorbed, ac-
cording to its owners, over $200,000,000 in
their capital plus unstated amounts in pub-
lic funds. The owners seek to shift their

loss to the United States, making use of the consent granted in the Tucker Act, 28 U.S.C. § 1491, to sue the government for just compensation in instances of takings of property "for public use." The Claims Court dismissed the suit, without prejudice, for want of "jurisdiction" because it was premature but held, in the alternative, if the court had jurisdiction, the suit must be dismissed "with prejudice" because the property allegedly taken "was generated under the existing regulatory system." We hold that if premature at all, the suit was so as to only part of the claim, and the prematurity was not jurisdictional. Therefore, we turn to the alternative decision and hold the court had jurisdiction to make it and that the claimant had no legally protected property right to operate the plant, which could have been the subject of a fifth amendment taking, as against the fear it would injure the national security. Therefore, we affirm the dismissal with prejudice.

### Background

The Claims Court decision, 12 Cl. Ct. 372 (1987), embodied a full statement of the factual background, expanded in a factual appendix into great detail, service by the judge beyond the call of duty in a case such as this was, of cross-motions for summary judgment. It is not necessary for us to duplicate all this material, and we will confine our summary to the minimum necessary for understanding our legal holding.

Before the Atomic Energy Act (AEA) of 1954, 42 U.S.C. §§ 2011–2282, the United States Government, which had discovered how to achieve nuclear fission, and exploited it in the world's first atom bomb, pretty much kept to itself even the development of peaceful uses. The AEA had, however, as one of its objects, the enlistment of private capital, which was supposedly better able to control its costs, in the development of electric power from nuclear fission. A number of private companies came into being which were to feed electricity into the ordinary power grid, but with such fission as the source, instead of combustion, or the fall of water. One of the problems the newborn companies faced

was the disposal of their "spent fuel." The government agreed to take care of that. The best way to do it appeared to be a recycling process. The fuel, enriched uranium dioxide, became "spent" in the course of its use, i.e., no longer able to produce power, but radioactive and dangerous still. It had, in part, been transmuted into plutonium. Disposal was difficult. The government therefore promised the power producers to recycle the spent fuel. This involved separating the plutonium from other components, and it could be used for military purposes or to make more fuel. The plant involved in this case is solely to perform this recycling operation and, except for minor structures which have been dismantled and carried away, it is nearly useless for anything else.

Under the AEA it could be constructed and operated only under separate licenses which the Nuclear Regulatory Commission (NRC) could grant or withhold, taking into account, among other things, whether issuance "would be inimical to the common defense and security or the health and safety of the public." 42 U.S.C. §§ 2133(d), 2134(d). The parties agree that the NRC "induced" private industry to undertake the awesome reprocessing task, the motive of the NRC being, of course, its commitment to the power producers to dispose of their spent fuel. It believed that this operation, too, could be best performed by private industry with private capital. Besides jawboning, the "inducement" took the form of free land as well as technical assistance.

The appellants, being awarded a construction license in 1970, commenced construction in 1971 on the donated land at Barnwell, South Carolina, after which the plant is named. In 1974 the government commenced to process the operating license and besides, to prepare an environmental impact statement, here called GESMO. This is necessary for every government-sponsored project such as this (42 U.S.C. § 4321 and ff), and has never been completed.

While the record is replete with government "inducement," we note an entire absence of any evidence that the government

in any manner, express or implied, contracted to share whatever risks there might be in the venture, to warrant that it would succeed, or otherwise shield it against vicissitudes.

Apparently, in connection with the GES-MO study, concern began to be expressed as to the impact this plant might have on the problem of "nuclear proliferation." While every application of nuclear fission is fearsome to many, the possibility that nations, whose slogan is "death to the United States," having irresponsible, unprincipled, and bloody-handed dictators, might get nuclear weapons, is pretty near the top of anyone's list of dreads. The bearing of this on the Barnwell plant was evidently not seen when its construction was licensed. Since the recycling produces plutonium, anyone who had a peaceful plant powered by nuclear fission might, if he also had a recycling plant, obtain a nuclear weapon. Thus, checking the use of the recycling process in foreign countries was vital to the control of "nuclear proliferation," and how could the United States assume the lead in such an effort if it ran a recycling plant itself?

On April 7, 1977, President Jimmy Carter announced that because of the above concerns "we," the United States of America, will "defer indefinitely the commercial reproducing and recycling of the plutonium produced in the United States nuclear power programs." Accordingly, a freeze took effect in the processing of the operating license for the Barnwell plant, and in the GESMO. The wisdom and propriety of this action is of course not before us. *Florida Rock Industries, Inc. v. United States*, 791 F.2d 893 (Fed.Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

The parties have stipulated that the United States used Barnwell's operating license as a "bargaining chip." This we do not understand to mean that the operating license was actually bargained away to purchase some agreed concession from some foreign country. *Cf. Gray v. United States*, 21 Ct. Cl. 340 (1886). The case has not been argued on that basis. For the taker to take A's property right and grant it to B in return for consideration B has provided to the taker, is a fifth amendment case we do not have here, as our predecessor had in the *Gray* case. Rather, it was that the pursuit of reprocessing by the United States would undermine the credibility of its efforts to discourage production of plutonium abroad. The "bargaining chip" terminology is confusing and something more specific would have been more helpful to the court.

On October 8, 1981, President Reagan announced he was "lifting the indefinite ban which previous administrations placed on commercial reprocessing activities in the United States." However, there has been no action by the NRC or the Department of Energy to revive consideration of the operating license or the GESMO. The government used the plant for R & D from 1977 to 1983, but without profit to Allied–General. Counsel stated that some salvageable portions of the plant have been removed and carried off, but most of it stands there, empty and forlorn. Allied–General has not made any use of what the trial court calls "statutory procedures" to reactivate the license, and that court thinks that if no more, Allied–General should insist on and obtain a final executive decision on its license application. The court cites Supreme Court authority that a taking claim for a regulatory action is premature until one knows "the nature and extent of permitted development."

Among various lawsuits in which Allied–General has been embroiled, respecting Barnwell, one is particularly important. The others can be left to the trial court's summary. Allied–General was a party to the case reported as *Westinghouse Electric Corp. v. United States*, 598 F.2d 759 (3d Cir.1979). In that case, the freeze, called a moratorium, was reviewed as to its propriety under the law. It had then been of about two years' duration. The court held it well within the purpose of the AEA to consider holding up the license because of the goal of securing international nonproliferation. It opined, if the application was held so long it appeared to be *de facto* denied, and if appropriate findings were

not made, judicial recourse would be available. This was not a suit for just compensation, and was not considered under that aspect.

### Discussion

### I

■ The trial court's analysis is for the most part sound and its consideration of the precedents exhaustive. We refer the reader to it, but do not adopt it as our own opinion. We agree with the trial court that it is not reasonable to ask the court to assess damages for a taking when it is not known just what interest is taken, or when, or for how long, and these are matters best left to be stated by the alleged taker itself. If it refuses to say, inferences can be drawn, as the Third Circuit stated. It may, however, not be at all reasonable to ask the claimant to delay in filing his suit. If, as here, a taking claim is stated, the court has jurisdiction of the subject matter and it may do a great injustice if it dismisses, even without prejudice, a claim brought almost 6 years (the statutory period of limitations) after it first arguably accrued. As we did in *Aulston v. United States*, 823 F.2d 510 (Fed.Cir.1987), here the sensible thing to do would be to retain jurisdiction and suspend further action pending a proper application to the alleged taker and an opportunity for it to show what its intentions are, except that the claim fails on other grounds. This is particularly true when, as here, the taker may end up the unwilling purchaser of a $200,000,000 but useless facility.

Subject-matter jurisdiction of the federal courts is initially determined according to the "well-pleaded complaint." *Gronholz v. Sears, Roebuck and Co.*, 836 F.2d 515, 5 U.S.P.Q.2d 1269 (Fed.Cir.1987). The court may determine, of course, whether it lacks jurisdiction and the well-pleaded complaint affords a sufficient starting point in answering such a question. In assessing the complaint, the court is not precluded from considering other threshold issues as well, all with the goal in mind of determining the court's jurisdiction. *Id.* The exhaustion requirement is not, strictly speaking, a

matter of jurisdiction. *United States v. Priority Products, Inc.*, 793 F.2d 296, 4 Fed.Cir. (T) 88 (1986). Even if the statement of the claim in the instant complaint showed on its face, which it does not, that administrative remedies then existed which had not been exhausted, the fact still remains that between April 7, 1977, when President Jimmy Carter announced his policy, and October 8, 1981, when President Ronald Reagan announced his, no administrative remedy existed not obviously futile and a waste of time. During that period, the taking most likely occurred, if it occurred at all. If it occurred during that period, there is no mystery what the taker took. It took the entire fee. On the other hand, it is arguable from the complaint that a temporary taking occurred well before the permanent one, even if no permanent taking occurred. The Supreme Court has held, in a decision that came *after* the trial court decision, that any lapse of time when use of property was delayed by the deliberations of administrative bodies must, if it qualified otherwise, be dealt with as a temporary taking. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, —— U.S. ——, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The decision torpedoes the assumption of the California courts that a dispute over what the alleged taker can do without incurring just compensation liability must, if the taker is wrong, be resolved by injunctive relief alone, with no money damages, because otherwise the alleged taker is made into a real one without ever intending to take that role. In federal law, of course, the governmental entity is made into an involuntary purchaser and may end up owning property it does not want, by operation of the Tucker Act, which does not have a California counterpart. The idea of a temporary taking while deliberations drag on is applicable to federal acts and obviously not anticipated by the trial court.

Accordingly, we hold that the Claims Court had jurisdiction. In view of this, the trial court properly passed beyond the threshold exhaustion issue to examine whether the expectation of being awarded

an operating license was a property right protected by the fifth amendment.

## II

We think the basic rule that is dispositive here is that as against reasonable state regulation, no one has a legally protected right to use property in a manner that is injurious to the safety of the general public. *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887). Too late to have been noted by the trial court, there has been an interesting development regarding that century-old case. A major constitutional holding in its day, its authority had been thought impaired by later cases and particularly by *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). We touched on this idea in *Florida Rock,* 791 F.2d at 900, because then Chief Judge Kozinski, deciding *Florida Rock* for the Claims Court, had raised the question. We thought, however, in the hypothetical event of a landowner leaking a septic fluid into the Miami drinking water, *Mugler* would be found very much alive as a precedent. The rule of *Mugler* is drastic indeed. Kansas had adopted by constitutional amendment—the first of its kind in the nation—strict prohibition of manufacture and sale of all alcoholic beverages. This rendered Mugler's brewery of no value and he contended it had been taken without just compensation. The 1887 Supreme Court held that state action under its "police power" to protect the "public health, the public morals, and the public safety," cannot be a taking. Moreover, the legislative judgment as to what measures were appropriate in exercise of that power was not for judicial review.

Now in *Keystone Bituminous Coal Ass'n v. DeBenedictis,* —— U.S. ——, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), the Supreme Court has dusted off *Mugler* and put it back on its pedestal, while reducing *Pennsylvania Coal Co. v. Mahon* as a precedent pretty much to its own peculiar facts. Mugler commenced his business, so far as appeared, before any scheme of licensing existed that he might have argu-

ably accepted as a condition. There was not in *Mugler* any attempt to justify the regulation by showing Mugler was not hurt so much as might appear. This has been a feature of modern regulatory taking cases, including *Keystone.* Nor had he any administrative remedy he had not exhausted. The dissent in *Keystone* agrees that a compensable taking does not necessarily occur when the government uses its authority to prevent a property owner from using his property so as to injure others, but argues that this, which it calls the "nuisance exception," does not apply to every case when the state uses its police power to curtail private rights.

A later case, also rehabilitated as precedential, is *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915). We must, of course, transpose these statements from actions by states to those of the Federal Government. The state police power, as now described by the Supreme Court, no longer includes protection of "morals" but "welfare" is added. These changes do not concern us. The Federal Constitution exists, as stated in the preamble, for "the common defence." There can be no doubt that President Carter considered nuclear proliferation was a threat to that defense, and that consequently the processing of spent fuel at the Barnwell plant was a danger he must avert. In *Radioptics, Inc. v. United States,* 223 Ct.Cl. 594, 621 F.2d 1113, 1127 (1980), one of our predecessor courts stated that: "where the purpose of a regulation which causes interference with property rights is to prevent injury to the public welfare as opposed to merely bestowing upon the public a nonessential benefit, compensation under the fifth amendment is not required."

The Third Circuit holding in *Westinghouse Electric Corp.* would constitute a collateral estoppel on the parties to that case, if one is needed, as to that issue. This provision in our view stands, with respect to the just compensation clause, the same as state action to protect public "health, morals, and safety" stood a century ago, or "health, safety, and welfare" today. One who proposes use of property injurious to common defense stands vis-a-

vis the Federal Government the same as one whose use of property would be injurious to the interests the state protects under its police power.

### III

If, however, despite its absence in *Mugler,* some antecedent acceptance of the regulatory scheme by appellants here is requisite if the government is not to be liable for a taking, such acceptance occurred. Appellants do not deny they accepted the regulatory scheme so far as it might have resulted in denial of construction or operating licenses on the ground the plant, as appellants would operate it, was unsafe. They deny that nuclear proliferation grounds were within the contemplation of the parties. However, the statute required the agency to take into account the common defense and security of the nation in passing on the licenses. We cannot believe that this did not include the unforeseen as well as the predictable. The attendant circumstances: the novelty of nuclear fission, the fearsome effect of its use in war, the public fears, all forbid us to suppose that the government had committed itself to use of its licensing power not to respond to some new ground of hesitation just because it was not originally foreseen.

Use of the licensing power is invalid if it is used to accomplish some object not within the purpose of that power, *Nollan v. California Coastal Commission,* — U.S. ——, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), but the prevailing opinion in *Nollan* concedes that use for purposes within the object of the power reserved will be valid even if detrimental to the owner's full utilization of the property. *Id.* 107 S.Ct. at 3146–47.

### IV

Appellants have much to say about the "inducement" extended to them on the government's behalf to obtain the commitment of private capital that occurred. There was extended negotiation, with much "jawboning" on the government's part, with tender of technical assistance, and the

government also furnished the land. This history of direct negotiation is unusual in regulatory taking cases, and we have not much guidance in the precedents to aid our deliberations.

We find the absence of a contract count in the complaint to be dispositive. One undoubtedly would be there if the existence of a contract right would be arguable, and one is present in the companion case, *NL Industries v. United States,* 839 F.2d 1578 (Fed.Cir.1988), argued before the same panel the same day. Contract rights enforceable in the Claims Court include not only express contracts, but also contracts implied in fact. For example, in *Padbloc Co. v. United States,* 161 Ct. Cl. 369 (1963), the government was held to be liable to pay just compensation on an implied contract theory if it misappropriated and used intellectual property not amounting to a patent or copyright, and submitted under restrictive clauses for the purpose of making a sale. *Padbloc* is explained and limited in *Radioptics, Inc., supra.* Likewise, before enactment of the present 28 U.S.C. § 1498, consenting to suits against the government for patent infringements by it or committed on its behalf, the holder of a patent infringed by the government occasionally could sue on an implied contract theory if he could show he had offered the invention to the government expecting to be paid and the government used it, expecting to be called on to pay. *E.g., Berdan Fire-Arms Mfg. Co. v. United States,* 25 Ct. Cl. 355, 26 Ct. Cl. 48 (1890), *aff'd,* 156 U.S. 552, 15 S.Ct. 420, 39 L.Ed. 530 (1895). Arguably, the principle would apply if the government induced private capital to embark on a project, expecting for its part to be called on to cooperate in making the project a success, or at least to do nothing harmful, and the contractor invested his capital, expecting it to be sheltered from adverse government action. We do not so decide, but in any event, the assertions about "inducement" in this case are not such as would support a good faith count pled along the line suggested. We think the hypothetical is the nearest to our actual case the law would go—if it went that

far—in attaching significance to "inducement" by the government to private parties to invest their capital in a business enterprise. After all, when the government desires reluctant private capital to invest in risky enterprises, it is accustomed to make express contracts to "induce" by reducing or sharing the risk. The constitutional control of Congress over the public fisc is an adverse factor against liability for mere "jawboning" by government employees not authorized to commit it to legal liability. *NBH Land Co. v. United States,* 217 Ct.Cl. 41, 576 F.2d 317 (1978). *See also Empresas Electronicas Walser, Inc. v. United States,* 223 Ct. Cl. 686, 650 F.2d 286 (1980).

### Conclusion

The judgment of the Claims Court is reversed respecting the unripeness of the complaint and dismissing without prejudice. It is affirmed respecting its fifth amendment holding, and the cause is remanded with directions to dismiss the complaint with prejudice.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.