UNITED NUCLEAR
CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 223–84L.

United States Claims Court.

July 27, 1989.

See also 12 Cl.Ct. 45.

Peter J. Nickles, Washington, D.C., Atty. of Record, for plaintiff. Steven J. Rosenbaum, Covington & Burling, Michael W. Brennan, Jon S. Indall, and Stephenson, Carpenter, Crout & Olmsted, of counsel.

Alan Brenner, Washington, D.C., with whom was Asst. Atty. Gen. Roger Marzulla, for defendant. R. Anthony Rogers, of counsel.

## OPINION

NAPIER, Judge:

This case involves a suit filed under 28 U.S.C. § 1491 (1982) by plaintiff, a corporation organized under the laws of the State of Delaware. The complaint alleges a

Fifth Amendment "taking" by inverse condemnation in the Grants Mineral Belt in northwest New Mexico.

## FACTS

The Grants Mineral Belt covers an area measuring roughly 100 miles longitudinally, and 10 to 15 miles latitudinally. Three hundred thirty (330) million pounds of uranium, or approximately 55 percent of all uranium produced in the United States, has come from the Grants Mineral Belt. It is the premier uranium-producing area in the country.

In the late 1960s, the Kerr–McGee Corporation had acquired uranium leases in the Grants Mineral Belt which were located on the Navajo Indian Reservation. Kerr–McGee had undertaken significant exploratory work on its leases. The type of exploratory drilling being conducted by Kerr–McGee made it clear to other uranium companies that a sizable discovery had been made. The exploration efforts by Kerr–McGee and other companies in the area strongly suggested that there was a significant potential for uranium to be discovered on areas of the Navajo reservation not covered by the Kerr–McGee leases.

The Navajo Tribe recognized this potential. On November 18, 1970, the Advisory Committee of the Navajo Tribal Council, by an unanimous vote, authorized the Secretary of the Interior to conduct public bidding for the lease of specified tribal lands. These leases were for the purpose of uranium mining.

In April and May 1971, the Secretary of the Interior and his agents determined to lease various tracts of land on the Navajo Reservation in New Mexico on behalf of the Tribe. To this end, the Secretary issued an invitation for sealed bids. UNC was the successful bidder for two tracts of land, and on June 29, 1971, entered into two leases with the Navajo Indian Tribe which permitted the plaintiff to mine for certain minerals including uranium ore on lands of the Tribe near Gallup, New Mexico. The primary term of the leases extended for "a term of 10 years from the date of * * * approval and as long thereafter as the minerals specified are produced in paying quantities." On July 7, 1971, pursuant to statutory authority,[1] the Secretary of the Interior approved the mineral leases entered into between UNC and the Navajo Tribe.[2]

UNC was a major participant in the uranium mining industry in the 1970s. The company was the second or third largest domestic uranium producer in 1977 and 1978. UNC's Churchrock mine, located in New Mexico just off the Navajo Reservation, was the largest underground uranium mine in the United States in 1978. Besides the Northeast Churchrock mine, UNC had uranium mining operations at several other locations in the Grants Mineral Belt: an underground mine and an open pit mine on the Cebolleta Grant; 5 or 6 mines in the Ambrosia Lake District; and the Black Jack I and Black Jack II mines in the Smith Lake District.

UNC had as much experience in uranium mining as any producer in the United States. The company had 2,690 employees involved in uranium operations in fiscal year 1979. UNC had net earnings of $21.5 million in 1977, $31.8 million in 1978, and $43.8 million in 1979.

---

1. 25 U.S.C. § 81 states in pertinent part:
   No agreement shall be made by any person with any tribe of Indians * * * for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him * * * unless such contract or agreement be executed and approved as follows: * * *
   Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.
   25 U.S.C. § 396a states in pertinent part:
   * * * lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction * * * may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

2. Subsequent to entering into the leases, UNC assigned one-half of its leasehold interest to the Tennessee Valley Authority (TVA). TVA is not a party to this action.

UNC paid the Navajo Tribe an initial bonus of seventy-nine thousand ($79,000) dollars for the leases. The Tribe still retains this money. In addition, UNC agreed to pay royalties to the Tribe ranging from 12 percent to 25 percent, depending upon the richness of the ore. Further, the lease agreements committed UNC to paying rental fees annually and minimum royalties annually beginning in the fourth year of the leases. As of June 1981, UNC had paid the Navajo Tribe over $220,000 under these lease provisions. Under both statutory and regulatory authority, UNC's leases could not become effective until approved by the Secretary of the Interior. *See* 25 U.S.C. § 396a; 25 C.F.R. § 171.2 (1971).

By regulation, UNC could not commence exploration on the subject lands until the Secretary approved its exploration plan. 25 C.F.R. § 177.6 (1970), now designated § 216.6. By regulation, approval of UNC's exploration plan was delegated to the Regional Mining Supervisor of the United States Geological Survey. Subsequent to the approval of the leases by the Secretary of the Interior, UNC submitted and received approval from the Secretary of an exploration plan as required by regulation.[3] UNC explored for and discovered valuable deposits of uranium ore on the leased lands. The total expenses incurred by UNC for exploration and related activities ultimately reached $5,366,835. This is exclusive of the amount spent by UNC's co-venturer, the Tennessee Valley Authority. As a result of this exploration, UNC discovered sizable uranium reserves.

UNC's exploration efforts resulted in the discovery of more than 20 million pounds of uranium reserves on the subject lands.

UNC therefore determined to conduct mining operations that would result in the production of uranium in paying quantities, and UNC's continued ownership of its leasehold interest. There was a great potential for additional uranium reserves on the subject lands. Substantial areas of the subject lands were not explored because the surface topography made drilling impractical. UNC believed that there was a potential for 20 million additional pounds of uranium on these unexplored portions of the subject lands. UNC's intention to engage in mining operations on the subject lands was conveyed to its stockholders. In its 1977 Annual Report, UNC informed its stockholders that the "deposit [on the subject lands] has been determined to be economically minable and has been turned over to [UNC's] Mining and Milling Division for development."

On February 24, 1977, as required by regulation,[4] UNC explored for and discovered valuable deposits of uranium ore on the leased lands. UNC submitted to the United States Geological Survey (USGS), a Bureau of the Department of the Interior, for approval, a mining plan for mining operations on the leased lands. The mining plan satisfied each of the requirements set forth in the mining plan regulations.[5] However, the Department of the Interior withheld approval of the mining plan for a period of more than 4 years, deferring to the Navajo Tribe approval of the plan. UNC alleges that tribal approval for mining plans on lands leased by an Indian tribe was not required or authorized by statute, regulation, or the lease agreements.

On either April 4 or April 7, 1978,[6] a meeting took place between UNC and Inte-

---

**3.** *See* 25 C.F.R. § 177.6 (1977), Approval of Exploration Plan, which states in pertinent part:

    (a) Before commencing any surface disturbing operations to explore, test or prospect for minerals, the operator shall file with the mining supervisor a plan for the proposed exploration operations.

**4.** *See* 25 C.F.R. § 177.7 (1977), Approval of Mining Plan, which states in pertinent part:

    (a) Before surface mining operations may commence under any permit or lease, the operator must file a mining plan with the

mining supervisor and obtain his approval of the plan.

**5.** *See* 25 C.F.R. § 177.4 (1977), Technical Examination of Prospective Surface Exploration and Mining Operations, and 25 C.F.R. § 177.7 (1977), Approval of Mining Plan.

**6.** April 7, 1978, was stated as the date of the meeting in plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss filed with the United States District Court for the District of Columbia. Civil Action No. 81–1537. April 4, 1978, was the date stated by Arthur W. Woods in an affidavit signed June 23, 1981.

rior Department officials. At this meeting and without forewarning, UNC was informed that the Department of the Interior was giving the Navajo Tribe a veto power over the mining plan and that the Department and USGS were refusing to take any action on the mining plan until the Tribe approved it.

Upon learning of the Department of Interior's imposition of the requirement of Navajo Tribe approval, UNC made repeated and continuous efforts to gain such tribal approval. In addition, UNC sought to convince the Secretary to withdraw the requirement of tribal approval of the mining plan.

On July 6, 1981, one day before its leases were to expire, UNC filed a civil action [7] in the United States District Court for the District of Columbia against the Secretary of the Interior seeking a declaratory judgment that the Secretary had wrongfully failed to approve or otherwise timely act on the mining plan. UNC also sought injunctive relief to extend the term of the leases and to require the Secretary to act promptly on UNC's mining plan and to prevent the Secretary from approving any other leases, contracts, or agreements for mineral rights pertaining to the leases in question.

Judge Harold H. Greene in a memorandum order dated May 31, 1982, stated that "[t]he Secretary refused to approve the plan because the Navajo Tribe had not given its approval, although tribal approval is apparently not required by statute, regulation, or the leases themselves." [8] However, Judge Greene ruled that UNC was required to join the Navajo Tribe as an indispensable party as the Tribe was the actual lessor of the land. UNC was unable to join the Navajo Tribe, which successfully raised the defense of sovereign immunity. [9]

UNC's mining plan was complete from a technical perspective, and set forth an acceptable mining method. UNC never received approval of the mining plan and on July 7, 1981, UNC's leases expired as a result of their failure to institute mining operations.

On April 4, 1978, in a meeting held at the Department of the Interior in Washington, D.C., senior officials of the Department informed UNC that Navajo tribal approval of UNC's mining plan would be required before the Department would approve that plan. Department of the Interior officials stated that BIA and USGS would not help expedite obtaining tribal approval, and that UNC was on its own. DOI officials stated that the Navajo Tribe could withhold approval and thus cause UNC's leases to expire, without having to provide any reason for its failure to approve UNC's mining plan. UNC was not told of any reason why the Department of the Interior was not approving UNC's mining plan other than the fact that the Tribe had not given its approval. [10]

The federal Government has trust responsibilities for the Indian Tribes, which create a fiduciary relationship between the federal Government and the Navajo Tribe on the part of the Government.

UNC concedes, as it has throughout the lawsuit, that the Secretary of the Interior had the authority to impose the tribal approval requirement. This relationship grew out of the United States Government's self-imposed responsibility for the lands of federally-recognized tribes.

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers.

**7.** See United Nuclear Corp. v. James G. Watt, No. 81–1537, Memorandum Order (D.D.C. May 31, 1982).

**8.** Id., Memorandum Order at 1.

**9.** In United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1977), the Supreme Court stated:

> The powers of Indian tribes are, in general, "inherent powers of a limited sovereignty which has never been extinguished." F. Cohen, Handbook of Federal Indian Law, 122 (1945) (emphasis in original). * * *

**10.** At trial, credible testimony revealed Tribal concerns about the potential loss of the Tribe's drinking water supplies and the cumulative effects of the proliferation of uranium mines in the area. However UNC had met necessary environmental impact requirements.

The Assistant Secretary for Indian Affairs believed that the Secretary of the Interior had the authority to impose a requirement of tribal approval of mining plans, pursuant to his trust and fiduciary responsibilities to the Tribe.

The tribal approval policy was adopted, approved, and implemented by high level officials of the department, including the Acting Deputy Director of the Office of Trust Responsibilities, BIA; the Director, Office of Trust Responsibilities, BIA; the Chief, Division of Trust Services, BIA; the Acting Deputy Commissioner of Indian Affairs; the Associate Solicitor of Indian Affairs; the Chief, Rights Protection Division, BIA; and the Assistant Secretary, Energy and Minerals, U.S. Department of the Interior. The Department of the Interior attempted to apply the tribal approval requirement in a consistent fashion.

On May 4, 1984, UNC filed its complaint in the United States Claims Court alleging that the Department of the Interior's failure to approve the mining plan constituted a taking of property without just compensation in violation of the Fifth Amendment to the Constitution of the United States.

## DISCUSSION

### A. *Statute of Limitations*

UNC filed this lawsuit on May 4, 1984, within six (6) years of the alleged taking, which the Court finds to be October 1, 1978. For a full discussion of the statute of limitations, *see* Order filed March 19, 1987 (12 Cl.Ct. 45 (1987)).

On October 1, 1978, the Tribe's failure to act on UNC's mining plan, coupled with the Government's refusal to approve the plan unless Navajo approval were first obtained, rendered UNC's leases substantially less valuable. UNC's mineral leases were of value only insofar as UNC was able to mine minerals from the subject lands. According to credible testimony, in order for UNC to maintain its right to do so, the company had to produce minerals in paying quantities within 10 years after the signing of the leases, i.e., by July 7, 1981. Thus, UNC's leases were rendered valueless at the point when the Government's and Navajo Tribe's failure to approve the mining plan made it impossible for UNC to commence operations in time to produce minerals in paying quantities by July 7, 1981.

Expert testimony established that the date on which those mining operations would have, under normal circumstances, to have commenced was on or about October 1, 1978. Accordingly, the Navajo Tribe's failure to grant its approval of the mining plan by October 1, 1978, coupled with the Government's refusal to approve the plan unless Navajo approval were first obtained, resulted in a taking date of October 1, 1978.

UNC's ability to have commenced mining operations by October 1, 1978, and to have produced minerals in paying quantities by July 7, 1981, is confirmed by estimates from outside contracting firms as to the length of time necessary to begin sinking the shaft on the subject lands and produce minerals in paying quantities.

Under severe time pressures, UNC could have commenced mining operations as late as January 1, 1979, and still been able to produce minerals in paying quantities by July 7, 1981. Defendant's expert agreed with this assessment. Under geological conditions almost identical to the subject lands, UNC had sunk a shaft at its Northeast Churchrock mine to a depth of 1,788 feet in approximately 22 months.

If UNC's mining plan had been approved in time to allow the production of paying quantities by July 7, 1981, testimony revealed that UNC would have immediately commenced sinking the shaft. UNC had available all the equipment necessary to construct the mine. The testimony revealed that had UNC received approval of its mining plan, it could have been on site, starting mining operations, within 2 to 4 hours.

Thus, UNC's claim comes within the limitation period for purpose of the Court's jurisdiction.

### B. *The Alleged Taking*

The Court takes guidance in determining whether or not a compensable constitution-

al "taking" has occurred by applying the analysis set forth in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986). In *Connolly*, the Supreme Court has stated:

In all of these cases, we have eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case. [*Ruckelshaus v. Monsanto Co., supra,* 467 U.S. [986], 1005, 104 S.Ct. [2862], 2874, 81 L.Ed.2d 815; *Kaiser Aetna* [*v. United States*], *supra* 444 U.S. [164], 175, 100 S.Ct. [383], 390 [62 L.Ed.2d 332]. To aid in this determination, however, we have identified three factors which have "particular significance:" (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Central Transportation Co.* [*v. New York City* ], *supra,* 438 U.S. [104], 124, 98 S.Ct. [2646], 2659 [55 L.Ed.2d 631]. *Accord Monsanto Co., supra* [467 U.S.] at 1005, 104 S.Ct., at 2874; *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 82–83, 100 S.Ct. 2035, 2041– 42, 64 L.Ed.2d 741 (1980).

In applying the test suggested in *Connolly*, there is an underlying question of reasonableness implicit in each inquiry. A determination of reasonableness is based upon weighing factual issues, and what is reasonable in a given set of circumstances is an issue of fact. *Hendricks v. United States,* 10 Cl.Ct. 703, 706 (1986), *citing Chernick v. United States,* 178 Ct.Cl. 498, 504, 372 F.2d 492, 496 (1967).

Under *Connolly*, the Court is first required to inquire into the economic impact of the regulation on the claimant.

The Court of Appeals for the Federal Circuit in *Florida Rock Industries v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986), gave guidance to this Court in assessing economic impact by stating:

There is no fixed formula to determine how much diminution in market value is allowable without the fifth amendment coming into play. We are not cited to, nor have we found, cases comparing the owner's investment or basis with the market value subject to the regulation and applying any rule or formula with respect thereto, *but we deem that a relevant consideration for exercise of a value judgment.* [Emphasis added.]

In this case, the economic impact to UNC has been severe. Although the mining plan was never approved, a $79,000 bonus remains with the Tribe and UNC spent over $5 million in exploration and related activities, not excessive under the circumstances. When the leases expired, there were no other viable uses for them from UNC's perspective. UNC made every effort to gain approval of the mining plan. The testimony establishes that UNC meets "the severity of the economic impact test" set forth in *Connolly*.

A second suggested inquiry in *Connolly* is whether the activity interfered with a distinct investment-backed expectation.

This Court has previously focused on reasonable investment-backed expectations as "a concept of fundamental justice and fair play, [which] suggests that even valid regulatory action can result in a taking if government shifts too heavy a burden upon a few individuals, and does so in a sudden and unanticipated manner so that those adversely affected have little opportunity to protect themselves in the market place." *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237, 242 (1983), *aff'd,* 765 F.2d 159 (Fed.Cir.1985).

Chief Judge Kozinski in *Shanghai Power,* 4 Cl.Ct. at 242, 243, specifically enumerated a number of determinations based upon a factual analysis which are relevant to whether or not a "taking" has occurred. These include:

* * * the degree to which the property owner's rights were impaired, the extent to which the property owner is an incidental beneficiary of the governmental action, the importance of the public interest to be served, whether the exercise of governmental power can be characterized as novel and unexpected or falling

within traditional boundaries, and whether the action substituted any rights or remedies for those that it destroyed. In determining whether a taking has occurred the court must weigh all of the relevant factors and decide whether compensation is required by principles of justice and fair play. *See Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979); *Deltona Corp.,* 657 F.2d [1184], 1191, 228 Ct.Cl. [476] 488. (Footnotes omitted.)

The third inquiry in the *Connolly* analysis involves the character of the governmental action. In the present case, the Government neither permanently nor physically appropriated the plaintiff's property for its own or public use. Rather the Government decided to defer approval of the mining plan to the Navajo Tribe, which, along with the Government, never acted on the plan. The action of the Government was regulatory in nature. The Court is charged with assessing the character of the Government action in identifying a regulatory taking by a "weighing of the private and public interest," *Florida Rock Industries, Inc.,* 791 F.2d at 904, which also implies a concept of reasonable conduct. *See* Chief Judge Kozinski's analysis in *Shanghai Power, supra.*

The second and third tests under *Connolly* are considered together and applied to this case in light of *Allied–General Nuclear Services, Inc. v. United States,* 12 Cl.Ct. 372 (1987), *aff'd* 839 F.2d 1572 (Fed. Cir.1988), decided after trial of the instant matter. The court requested briefing on the *Allied–General* decision, and briefs have been filed.

■ Leasehold interests are property interests protected by the Fifth Amendment. *Devines v. Maier,* 665 F.2d 138, 141 (7th Cir.1981); *United States v. 2,847.58 Acres of Land,* 529 F.2d 682 (6th Cir.1979); *Phillips v. United States,* 243 F.2d 1, 2 (9th Cir.1957); *Eagle Lake Improv. Co. v. United States,* 160 F.2d 182 (5th Cir.), *cert. denied,* 332 U.S. 762, 68 S.Ct. 64, 92 L.Ed. 347 (1947).

■ Government action that works a taking of property rights necessarily impli-

cates the constitutional obligation to pay just compensation. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987). Claims for just compensation are grounded in the Constitution itself. *Id.* In the event of a taking, the compensation remedy is required by the Constitution. Inverse condemnation is a "shorthand description of the manner in which a landholder recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Agins v. Tiburon,* 447 U.S. 255, 258 n. 2, 100 S.Ct. 2138, 2140 n. 2, 65 L.Ed.2d 106 (1980) (citation omitted). The doctrine of inverse condemnation is predicated on the proposition that a taking may occur without formal condemnation proceedings. *First English Evangelical Lutheran Church of Glendale, supra,* 107 S.Ct. at 2386.

■ A governmental regulatory act can constitute a taking. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, supra,* 107 S.Ct. at 2386; *PruneYard Shipping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Florida Rock Industry, supra,* 791 F.2d at 900. "At times * * * what were intended as mere regulations are converted by force of law into involuntary purchases called 'takings.'" *Florida Rock Industry, supra,* 791 F.2d at 894.

Governmental regulatory inaction can also constitute a taking. *Urbanizadora Versalles, Inc. v. Rios,* 701 F.2d 993 (1st Cir.1983); *Hernandez v. Lafayette,* 643 F.2d 1188 (5th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *Rogin v. Bensalem Township,* 616 F.2d 680 (3d Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *Amen v. Dearborn,* 718 F.2d 789 (6th Cir.1983), *cert. denied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984).

■ The economic impact of the Government's regulatory action was the destruc-

tion of UNC's leasehold interests. But the controlling question is whether UNC had distinct reasonable investment-backed expectations. It spent millions of dollars on the project.

UNC alleges that it reasonably relied on published regulations and lease terms and the information provided UNC by the Department of Interior, which led UNC reasonably to expect that its mining plan would be approved and that it would be permitted to receive the fruits of its investments. UNC was not an incidental beneficiary of the Government's actions, and the Government's actions did not substitute any rights or remedies for those that it destroyed. The treatment of UNC was different from preexisting practice and policy, and the imposition of the tribal approval requirement was a novel approach. UNC argues it was unexpected in view of the hundreds of lessees who had engaged in mining activities on Indian lands. UNC thus argues that the absence of other lessees that have suffered comparable injuries and the imposition of the tribal approval requirement clearly shifted a heavy burden on UNC, in a sudden and unanticipated manner, so that UNC had no opportunity to protect itself in the marketplace.

Nonetheless, in the Federal Circuit's most recent decision in a regulatory taking suit, the claimant in *Allied–General Nuclear Services, Inc. v. United States, supra,* alleged that the Government's refusal to consider its application for an operating permit constituted a taking of its license, its plant, or both. 12 Cl.Ct. at 375. On appeal, however, the Federal Circuit, in affirming the trial court's holding that no taking of a compensable property interest had been achieved by the Government's refusal to act on plaintiff's license application to operate its nuclear waste processing plant, upheld the trial judge's finding that what was alleged to have been taken was the *expectation* of being awarded a license to operate the plant, rather than either the plant itself or the permit previously granted to construct the plant. 839 F.2d at 1575–77.

Here, as in *Allied–General,* what is really the subject of an alleged taking by UNC is not its leases, but rather its expectation that its mine plan would be approved.

At trial, defendant argued, through its motion to dismiss at the conclusion of plaintiff's case, that it could not have appropriated plaintiff's leases since it did not exercise or make use of any of plaintiff's rights under the leases. Nor was any evidence offered that the Government intended to mine the property or acquire the ore either for itself or the Navajos in the future. Not having stepped into UNC's shoes, defendant argues that it did not appropriate the leases. The Government admits that it frustrated plaintiff's performance which caused the leases to expire. *See Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923).

Thus, this Court concludes that the property right which is the subject of this taking claim is not the leases. What is the subject property is UNC's expectation that it would be permitted by defendant to engage in mining the leased tracts. According to *Allied–General,* this is not a legally protected property right which can be the subject of a Fifth Amendment taking.

It would have been reasonable and prudent for UNC to question at the outset whether rules, regulations and requirements under the existing scheme, to which it voluntarily submitted itself, would change during the 10–year term of its lease. The leases themselves each contained a paragraph XVII specifically requiring the lessee to abide by and conform to the terms of the lease *"and all regulations of the Secretary of the Interior now or hereafter in force and relative to such leases* * * *."* (Emphasis added.)

One of plaintiff's witnesses testified that he obtained a sample lease prior to deciding whether to enter a bid for the leases and commit UNC to their terms and defendant's regulatory scheme. The express language of paragraph XVII makes it clear that the Secretary as trustee for the lessor expressly reserved the right to make changes, additions or modifications to the existing regulations which could affect the

leases. The existence of this provision in the lease is sufficient to render questionable UNC's investment-backed expectation that a subsequently imposed requirement regarding its mining plan approval would not be enacted by the Secretary in the next 10 years.

As in *Allied–General,* there is no evidence in the record that the Secretary contracted to share whatever risks in the venture, to warrant that it would succeed, or otherwise shield UNC against future risks and changes. *See Allied–General,* 839 F.2d at 1573–74.

It was not a reasonable investment-backed expectation that merely achieving technical adequacy of the mine plan under the regulations automatically *required* Secretarial approval of UNC's mine plan ministerially. A sophisticated company like UNC, schooled in the vicissitudes of Government, should have reasonably contemplated the possibility of Government inaction and delay.

The Court believes it was reasonable for UNC, in dealing with the Navajos and the Government, to assume that there would be tribal involvement in the mine plan decision-making process when weighed against the trust responsibilities of the Secretary created by the Indian Mineral Leasing Act of 1938 (25 U.S.C. §§ 396a–396f) and the Government's policy of Indian Self–Determination which had its origins in a policy statement by President Nixon in 1970 which, in turn, culminated in the enactment of the Indian Self–Determination and Education Assistance Act, 25 U.S.C. §§ 450, *et seq.,* some 2 years before UNC submitted its mine plan to USGS for approval.

Throughout this proceeding, UNC has argued that had it been aware that the Tribe would be given review and approval authority over its mine plan by the Secretary, it would never have bid for or entered into the leases. In *Allied–General, supra,* the plaintiff advanced the same argument to support its taking claim. The Federal Circuit, after having taken note of the fact that plaintiffs had accepted the regulatory scheme which they later charged in their suit caused a taking, went on to hold that

national security, the ground upon which President Carter later refused to grant the permit to operate the plant, was a requirement of the statute which had to be taken into account in passing on the permit to operate the plant. This requirement included the unforeseen, as well as considerations which plaintiffs could have contemplated at the outset. The Court ruled that implicit in such national security concerns was the President's belief that operation of the plant would create the impression the United States was engaged in nuclear proliferation.

As in *Allied–General,* UNC voluntarily accepted the regulatory system promulgated under 25 U.S.C. §§ 396a–396f when it bid for the leases. Although UNC could not expand the 10–year term of the lease to 15 years as it would have preferred, UNC nonetheless accepted the shorter term. *UNC also accepted standard lease provisions that were nonnegotiable, but fully known to UNC through the advertised bid information. Among the provisions UNC knew before entering into the leases was one requiring UNC to abide by and conform to the terms of the lease and all regulations of the Secretary now or hereafter in force and relative to the leases.*

Having accepted the regulatory scheme as Allied–General had, UNC must also accept the purposes of the statute which created it. It has been held that under the Indian Mineral Leasing Act of 1938, the best interests of the Indians must be taken into account when making any decision involving leases on tribal lands, and the Secretary has broad discretion to consider all factors affecting their interests. *Kenai Oil & Gas, Inc.,* 671 F.2d 383, 387 (10th Cir.1982). The *Kenai Oil and Gas* court concluded that such considerations were not limited solely to matters of conservation or production, because such a limitation would be inconsistent with the Secretary's trust responsibilities to Indians in leasing tribal lands.

Pursuant to that judicially-defined statutory purpose, the Secretary, through his designees, determined that the best interests of the Navajo Tribe would not be

served under his trust capacity by approving UNC's mine plan without prior tribal concurrence, in light of the cumulative impacts of such a mining operation over and above the mere technical mine plan requirements. These factors included tribal concerns about potential reduction of scarce drinking water supplies in an arid region and the addition of another major uranium mining operation to an already large number of such mines operating in an area which could not handle the burgeoning population and increased traffic that would impact the area. As the Federal Circuit noted in *Allied–General,* if the regulatory action is within the purpose of the statute, that action is valid even if detrimental to the owner's full utilization of the property.

Under *Allied–General,* which this Court finds controlling, plaintiff's case must fail. The Court is sympathetic to plaintiff's dilemma, but the Government's regulatory inaction frustrated plaintiff's contract; it did not appropriate it under the Fifth Amendment.

In *Allied–General,* the Federal Circuit's ruling on the ultimate taking issue was:
> * * * that the claimant had no legally protected property right to operate the plant, which could have been the subject of a Fifth Amendment taking, as against the fear that it would injure the national security * * *.

839 F.2d at 1573.

Accordingly, it follows that in the instant suit, United Nuclear had no legally protected property right to approval of its mine plan which would enable it to build and operate a uranium mine, as against the declaration of policy by Congress of assuring maximum participation by Indians with respect to services rendered to Indian communities so as to make such services more responsive to their needs. This necessarily included the planning, conduct and administration of those programs and services. 25 U.S.C. § 450a. The statute of Indian self-determination was enacted before plaintiff had completed its exploration of the tracts and prepared and submitted a mining plan. Pub.L. No. 93–638, § 3, 88 Stat. 2203 (1975). Moreover, the Indian Mineral Leasing Act of 1938 created trust responsibilities in the Secretary requiring him to represent the best interests of the Indians and confers upon him broad discretion to carry out that mandate of Congress. *Kenai Oil & Gas, Inc. v. Dept. of Interior,* 671 F.2d 383, 387 (10th Cir.1982). It is this statute and regulations upon which UNC's regulatory taking claim is based. In sum, these attendant circumstances are not confined to the predictable but include the unforeseen as well. Thus it follows that, as the Federal Circuit in *Allied–General* held, the Government did not commit itself to use its approval authority over mine plans in a manner which would not have been responsive to matters not originally foreseen, such as the tribal concerns regarding potential loss of the Tribe's drinking water supplies and the cumulative effects of the proliferation of uranium mines in the area of which plaintiff's was only one of many. *Allied–General,* 839 F.2d at 1577.

### CONCLUSION

Accordingly, the claimant had no legally protected property right to approval of its mining plan as against the declaration of policy to assure maximum participation by Indians in their affairs where the federal Government is involved. The Clerk is therefore directed to dismiss the complaint. No costs.